UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                              Plaintiff,                            Case No. 15-cr-20074

v                                                    Honorable Thomas L. Ludington

MICHAEL MCCOY,

                              Defendant.

_____/

**ORDER VACATING PREVIOUS ORDER, DENYING DEFENDANT MCCOY'S MOTION TO DISMISS, GRANTING DEFENDANT MCCOY'S MOTION TO AMEND, AND DENYING DEFENDANT MCCOY'S MOTION TO SUPPRESS**

On February 11, 2015, Defendant Michael McCoy was charged with Conspiracy to Produce Child Pornography, 18 U.S.C. § 2251(a),(e), and Distribution of Child Pornography, 18 U.S.C. § 2252A(a)(2)(A). According to the government, McCoy "routinely urged [his girlfriend] to molest [a minor] and photograph it for him," Resp. 5, ECF No. 22, and possessed "a large amount of child pornography" on his computer and phones. *Id*. at 4.

On May 20, 2015, McCoy filed a motion to dismiss the indictment, alleging that it violated double jeopardy and was the result of a vindictive prosecution. He also filed a motion to suppress the evidence recovered pursuant to a warrantless search of his cellphone and a subsequent insufficient warrant. A hearing on the motion to suppress took place in two parts, beginning on September 30, 2015 and continuing on December 14, 2015. Following the first hearing date, McCoy filed a motion to amend his motion to suppress to add a Frank's request pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). ECF No. 34.

On January 26, 2016 the Court issued an order granting McCoy's motion to amend and denying McCoy's motion to dismiss and motion to suppress. ECF No. 40. Because that order

failed to address one of the arguments raised by McCoy in his motion to suppress, it will be vacated. ECF No. 41.  For the reasons stated below, McCoy's motion to dismiss will be denied. His motion to amend will be granted and the hearings will be characterized as *Franks* hearings. However, because the searches of McCoy's cellphone and apartment were not performed by the government or any agent of the government, and because the officers executed the later search warrant in good faith, McCoy's motion to suppress will be denied.

## I.

At the hearing, Ms. Elizabeth Parish testified that she met McCoy's girlfriend, Hadassah Huber, in mid-July of 2012 while working together at the Indiana Wesleyan University cafeteria. Tr. II 31, ECF No. 39.  Eventually the two struck up a friendship, and Ms. Huber informed Ms. Parrish that she had a daughter. *Id*.

## A.

After a period of time, Ms. Huber informed Ms. Parrish that she had a boyfriend from out west who she had met online, and that she was in a dominant/submissive relationship with him in which he was dominant and she was submissive. Tr. II 49.  Ms.  Parrish testified that a few days later, Ms. Huber confided in Ms. Parrish that her boyfriend was sexually interested in children. Tr. II 32, 50. Ms. Parrish testified that she was not too shocked by Ms. Huber's disclosure because she had previously attended a sexual assault nursing class where they had discussed different types of sexual relationships.  Tr. II 52.  She testified that she asked Ms. Huber whether McCoy was interested in a specific age range, to which Ms. Huber responded that he preferred children somewhere around five and seven years of age. *Id*. Ms. Parrish testified that this disclosure concerned her, and that she asked Ms. Huber if she was concerned that McCoy would treat her daughter in such a way. Tr. II 51.  According to Ms. Parrish, Ms. Huber

responded that she would never let McCoy hurt her child and that she would never hurt her child. *Id.*

A few days later, Ms. Huber invited Ms. Parrish over to the apartment she shared with McCoy. Tr. II 32, 52.   Ms. Parrish did not immediately accept the invitation.   Tr. II 53. However, on her walk home Ms. Parrish decided to accept Ms. Huber's invitation to visit her apartment. Tr. II 37.   Ms. Parrish testified that she decided to go to the apartment because "in the best interest or her child I wanted to go over and see if there was anything I could find out so that I could help get the child to safety basically." Tr. II 35.   She testified that she was worried the child was the victim of a crime and that she wanted to help get the child out of the situation. Tr. II 35-36. Ms. Parrish testified that she was hoping to discover more "concrete information" concerning McCoy's interests in young children and more information about McCoy's identity. Tr. II 36.

### B.

On August 14, 2012, the day after receiving the invitation, Ms. Parrish went to the Marion County police station without an appointment. Tr. II 53-54.   She testified that she decided to go to the police instead of to child protective services because she thought that the information she had discovered would relate to a criminal matter.  Tr. II 48.   Upon arriving, she informed the receptionist that she wanted to speak with someone regarding information she had about a person she believed to be interested in child pornography.  Tr. II 33, 54.

There, Ms. Parrish met Officer Jay Kay for the first time.  Tr. II 33.   At the time, Officer Kay was captain of criminal investigations at the Marion Police Department. Tr. II 8.   Ms. Parrish informed Officer Kay that one of her coworkers—Ms. Huber—had a boyfriend named

Mike from out west who was sexually interested in young children, and that Ms. Parrish believed

he was in possession of child pornography.  Tr. II 34.

> According to Officer Kay's case report:

> Ms[.] Parish agreed to assist or provide any further gathered information and would talk to Hadassah about reporting to the police if she is frustrated, scared or feels trapped in this relationship.  Ms[.] Parish has been invited to their apartment tonight and may go to see what else she can discover about the boyfriend Mike and share the information with this Investigator.

Ex. B. Case Report at 2.  Ms.  Parrish testified that Officer Kay informed her that he could not

ask her to accept Ms. Huber's invitation, but that he provided her with his phone number in case

she chose to accept the invitation. Tr. II 34.  She further testified that Officer Kay told her not to

hesitate to call him if she felt unsafe at any point. *Id*. Ms. Parrish also credibly testified that

Officer Kay put no restrictions on what she could do or was going to do while at the apartment

and that he never asked her to start or stop investigating Ms. Huber and McCoy. Tr. II 38.

Instead, she testified that Officer Kay's primary focus was her safety. *Id*. Officer Kay testified

that he believed he gave her his business card and his cellphone number as he commonly does.

Tr. I. 14, ECF No. 32.

After leaving the police station, Ms. Parish viewed Ms. Huber's Facebook page to see if

it contained any information about McCoy. Tr. II 34.  Ms. Parrish testified that she did not

discovery any specific information about McCoy, but that she sent an E-Mail to Officer Kay

containing some of the personal information listed on Huber's Facebook page, such as her

hometown, high school, and job. Ex. C.  6:08 p.m. e-mail.  Ms. Parrish testified that any online

research she did regarding Ms. Huber and McCoy was limited to Ms. Huber's Facebook page.

Tr. II 35.

**C.**

While at the apartment that night, Ms. Parrish testified that she, Ms. Huber and McCoy played Wii and engaged in conversation. Tr. II 57.  She testified that Ms. Huber and McCoy were drinking but that she was not.  *Id.*  At 9:44 PM, Officer Kay sent Ms. Parrish a message asking, "You okay…? Did you go tonight?"  Ex. C. 9:44 P.M. E-mail.  Officer Kay testified that he sent the message because he did not know whether Ms. Parrish had gone to the apartment that night.  Tr. II 14.  Ms. Parrish testified that Officer Kay never asked her to pass along any type of information.  Tr. II 38. However, Ms. Parrish sent Officer Kay information regarding McCoy's last name and where he was from. Tr. I 15.

At some point in the night McCoy began to discuss his sexual interests, including his interest in sex clubs like Club Layden where people had public sex. Tr. II 61.  Ms. Parrish later texted the name of the club to Officer Kay, who responded that that seemed like an obvious name.  Tr. II 61.  McCoy also discussed his interests in online chat rooms. Tr. II 58.  McCoy informed Ms. Parrish that he had met Ms. Huber in a chat room, and that he had also spoken with other women in chat rooms. *Id.*  McCoy and Ms. Huber also discussed their interests in threesomes, and Ms.  Parrish informed them that she was not interested in threesomes. Tr. II 60.

McCoy then showed Ms. Parrish a YouTube video about a clown that was sexually interested in children. *Id.* Ms.  Parrish testified that she perceived the video to glorify sexual relationships with children.  *Id.*  Ms. Parrish testified that McCoy also told her that he was interested in children because they were young and innocent, that he had a Skype relationship with a girl who was about 16 years old, and that he liked pigtails and other things that younger girls wore. Tr. II 59.

Ms. Parrish testified that Ms. Huber's daughter was also present at the apartment that night. Tr. II 47.  At some point the girl's diaper needed to be changed, and McCoy insisted that

he be the one to change her diaper despite the fact that Ms. Parrish offered to do so. Tr. II 60.

Ms. Parrish testified that McCoy later insisted that he change the child's diaper again, but that he

eventually let Ms. Parrish change the child's diaper instead. *Id.* McCoy informed Ms. Parrish

that he was always the one who put the child to bed at night. *Id.*

Before McCoy and Ms. Huber went to bed, Ms. Parrish told them that her phone had died

and that her fiancée would be upset if she did not get in touch with him. Tr. II 41. In response,

McCoy gave Ms. Parrish permission to use his and Ms. Huber's phones and computers. Tr. II 41,

62.

Ms. Parrish testified that after McCoy and Ms. Huber went to bed, Ms. Parish pressed the

bottom center home button on McCoy's Apple cellphone. Tr. II 41. She testified that the picture

gallery was already open on McCoy's cellphone, and that she could see different subfolders

containing different types of pictures. *Id.* According to Ms. Parrish, one subfolder was labeled

"preteens" and that another subfolder specified an age group. Tr. II 63. Ms. Parrish testified that

she clicked on the folder labeled preteen, which displayed "a bunch of different thumbnails of

pictures", and that she then clicked on one of the pictures, which showed "a picture of a man

exposing his penis to a young girl." Tr. II 64. Ms. Parrish testified that the girl in the picture

appeared to be prepubescent and was wearing underwear. *Id.* Ms. Parrish then used her own

cellphone to take pictures of the image and subfolders contained in McCoy's phone. *Id.* She was

unable to send the information to Officer Kay at that time because her phone was out of minutes.

Tr. II 65.

Ms. Parrish also accessed Ms. Huber's computer, from which she sent an email. Tr. II 64.

She also looked at Ms. Huber's email folders and message panel. Tr. II 70.

Ms. Parrish credibly testified that Officer Kay never asked her to find additional information. Tr. II 61.  Instead, she testified that Officer Kay asked her multiple times if she was okay and if she felt safe. *Id.*  She testified that all of her discoveries were of her own volition. *Id.* Although Detective Kay referred to her as 00EB throughout their communication, Ms. Parrish testified that she was not working at the direction of Officer Kay and did not view herself as working for the Marion Police Department or any other government entity. Tr. II 67.  Officer Kay testified that once he discovered that Ms. Parrish had in fact gone to the apartment, he wanted to make sure that she was okay. Tr. II 15, 17.  He testified that, although Ms. Parrish passed him information such as McCoy's last name and that he was from California, he never asked her to look at phones or computers or even to look around the apartment. *Id.* He also testified that he did not encourage her to do any of those things, and had not foreseen that she would look at McCoy's phone. Tr. II 15, 19.

### C.

The next morning, after returning to her own apartment, Ms. Parish e-mailed Officer Kay that she "got a lot information once they went into the bedroom.  I have his email address, one of them, his phone number, three pictures of his phone (one of the main screen, one of the photo albums page and one of an actual picture. . . . I don't know how much of this you can use but hopefully all of it!" Ex. C. August 15, 2012 8:10 A.M. E-mail.  Ms. Parish further stated that she would send the photographs to Officer Kay as soon as her phone had minutes.

Ms. Parish sent the images to Officer Kay about one week later.  Officer Kay then contacted the National Center for Missing and Exploited Children (NCMEC) to determine whether McCoy's e-mail account had been the subject to any other child pornography investigations.  He eventually discovered that it had.

On December 17, 2012, Officer Kay swore out an affidavit to obtain a search warrant for

Huber's apartment.  The affidavit provides the following factual information:

> 8/14/2012, Concerned citizen reports to Marion Police that Hadassah Huber
> started talking about her boyfriend Mike who is into child pornography,
> photographs and videos sharing them over the Internet with others, and that he
> chats with teenage girls ages 12-16 frequently online.  Concerned citizen stated
> that Hadassah Huber was frustrated at the time she was talking about it, but did
> not believe she would cooperate with police.

> Concerned citizen was invited, and does go visit with Hadassah Huber at her
> apartment meeting her boyfriend, Mike McCoy.  During the visit of socializing
> with Hadassah Huber and Mike McCoy discuss some of their sexual activities or
> wants with threesomes, but nothing about child pornography.  Later that night or
> in the early morning of 08/15/2012 the concerned citizen ends up spending the
> night and sleeps on the couch.  Mike McCoy and Hadassah Huber loan her their
> cellular's to use and the Concerned citizen looks at Mike McCoy's cellular and
> discovers some  child pornography with a picture of a "young female child in the
> nude up close near and looking at an erect male penis", and then other screen
> images on Mike McCoy cellular of; email address of jasondarkbane@yahoo.com,
> Albums file listing, and one is marked as Preteens 122 which led Investigator to
> believe 122 pictures of preteens, other names, telephone numbers are observed
> and later provided this information and findings to the police.

> 08/27/2012, I requested assistance with Analyst with the NATIONAL CENTER
> OF MISSING & EXPLOITED CHILDREN reference this child pornography
> photograph and ask for any intelligence or history on the suspect Mike McCoy
> and the information shared with email and telephone numbers, learning from
> NEMEC Analyst that the email address; jasondarkbane@yahoo.com had received
> some nude image of child from an email address; amoneymaker77@aol.com
> located in the State of Kentucky.

Ex. A. at 5.  A judge signed the search warrant on December 18, 2012.  *Id*. at 3.

During the execution of the search warrant, police officer seized McCoy's computers and

cellphones, both of which contained a large amount of child pornography.  McCoy ultimately

confessed to possessing the child pornography.

The evidence seized during the search of the apartment provided the basis for three

prosecutions against McCoy.  First, McCoy was "quickly" charged in Indiana state court in 2012

for Child Exploitation. He was sentenced to four years' imprisonment, with two years suspended.

- 8 -

Then, a federal prosecutor in Utah charged McCoy with Transportation of Child Pornography and Production of Child Pornography. McCoy pleaded guilty to Transportation of Child Pornography and was sentenced to 66 months' imprisonment; the Production of Child Pornography charge was dismissed. Lastly, on June 14, 2013, the instant Indictment was filed in this Court, charging McCoy with Conspiracy to Produce Child Pornography and Distribution of Child Pornography.

## II.

In his first motion, McCoy contends that the Indictment should be dismissed for two reasons: first, because it violates Double Jeopardy; and second, because it was filed with "prosecutorial vindictiveness".

## A.

McCoy first claims that the indictment should be dismissed because it violates the Double Jeopardy Clause of the Fifth Amendment. The Double Jeopardy Clause provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It is well-settled, however, that the Double Jeopardy Clause does not prevent different sovereigns from separately prosecuting the same individual, "even if both are criminal suits for the same offense." *United States v. Louisville Edible Oil Prods., Inc.*, 926 F.2d 584, 587 (6th Cir. 1991) (internal citations omitted). Under the "dual sovereignty doctrine," the Constitution permits "consecutive federal and state prosecutions and convictions of defendants for crimes arising from the same transactions." *See United States v. McDonald*, 96 F.3d 1448 (Table), 1996 WL 506517, at *1 (6th Cir. Sept. 5, 1996) (citing *Abbate v. United States*, 359 U.S. 187, 196 (1959)). The exception for dual sovereignty flows from the understanding that every

sovereign has the authority to punish infractions of its own laws.  *United States v. Wheeler*, 435 U.S. 313, 317 (1978).

As explained above, McCoy has already had two criminal cases initiated against him for the conduct that occurred on August 14, 2012.  His double jeopardy argument rests on the first, in which McCoy was charged with Child Exploitation in Indiana state court.  McCoy argues that because he pleaded guilty to the Indiana state Child Exploitation charge, a lesser included offense of the current charges, the instant prosecution for Conspiracy to Produce Child Pornography and Distribution of Child Pornography violates his Due Process rights.

But, pursuant to the dual sovereignty doctrine, the prior Indiana state-court prosecution does not mean that the instant federal prosecution violates the Double Jeopardy clause because Indiana and the federal government are two separate sovereigns.  Therefore, even assuming that Child Exploitation is a lesser-included offense of the instant federal charges, McCoy's prosecution does not violate his Double Jeopardy rights.

**B.**

McCoy next claims that the indictment should be dismissed because it is the result of a vindictive prosecution.  McCoy contends that "the government has expressed its unhappiness with the length of Mr. McCoy's sentences in Indiana and Utah by charging him with conspiring to produce [child pornography] . . . Although the government possessed the images for two years, and Ms. Huber admitted that she took the photos of [the minor] in 2013, Mr. McCoy was not indicted until February 11, 2015, after the Utah sentence was imposed."  Mot. Dismiss ¶ 17.

A prosecutor has "broad discretion" in deciding whom to prosecute and which charges to bring.  *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001).  This discretion, however, "is not unfettered."  *Id*.  At a minimum, prosecutorial discretion is restrained by the Due Process

Clause, which prohibits the prosecution from punishing a defendant for exercising a protected statutory or constitutional right. *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).

If a defendant establishes that "(1) the prosecutor has some stake in deterring the [defendant's] exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable," then the district court may find that there is a "reasonable likelihood of vindictiveness" and may presume an improper vindictive motive. *Bragan*, 249 F.3d at 482 (internal quotation marks omitted). The legal standard for determining whether there is prosecutorial vindictiveness is "not whether there is an appearance of vindictiveness" but "whether, in the particular factual situation presented, there existed a 'realistic likelihood of vindictiveness' for the prosecutor's augmentation of the charges." *Andrews*, 633 F.2d at 453, 457. "Once a court has found that a realistic likelihood of vindictiveness exists, the government bears the burden of disproving it or justifying the challenged state action." *Bragan*, 249 F.3d at 482.

McCoy has not established that a realistic likelihood of vindictiveness exists because McCoy has presented no evidence that the prosecutor's conduct was unreasonable. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Assuming—for the moment—that the search warrant was valid, the Government had probable cause for the federal indictments. Thus, it is within the prosecutor's discretion to pursue additional charges against McCoy in federal court.

**III.**

McCoy also moves to suppress the evidence obtained pursuant to the search warrant issued on December 17, 2012.  McCoy first argues that the warrant lacked probable cause because it did not describe the nexus between the place to be searched and the evidence to be sought, and that a reasonable officer could not have relied on it in good faith.  McCoy also contends that the evidence obtained pursuant to Ms. Parish's search of his phone should be suppressed because it was obtained in violation of his Fourth Amendment rights.  He also seeks leave to amend his original motion to suppress in order to add a request for a hearing pursuant to *Franks*.  ECF No. 34.

### A.

The Government does not oppose or object to McCoy's motion to amend. Tr. II 5. Therefore, McCoy's motion to amend will be granted, and the hearings during which the witness's testimony was received will be characterized as *Franks* hearings.

### B.

McCoy claims that Ms. Parish's search of his cell phone violated his Fourth Amendment rights because she was acting as a government agent at the time of the search.  The protections of the Fourth Amendment are "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official."  *United States v. Jacobsen*, 466 U.S 109, 113 (1984).  Therefore, unless Ms. Parish was acting as an agent of the government at the time of her visit to Ms. Huber and McCoy's apartment, her searches of the apartment and of McCoy's phone are not subject to the Fourth Amendment's restrictions.

Whether a private individual's conduct is imputed to the government "turns on the degree of the Government's participation in the private party's activity, a question that can only be

- 12 -

resolved in light of all the circumstances." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614-15 (1989) (internal quotations and citation omitted). The Sixth Circuit uses a "two-factor analysis" in determining "whether a private party is acting as an agent of the government" such that the Fourth Amendment applies. *United States v. Bowers*, 594 F.3d 522, 525-26 (6th Cir. 2010) (quoting *United States v. Hardin*, 539 F.3d 404, 418 (6th Cir. 2008). Those two factors require an analysis of "(1) the government's knowledge or acquiescence" to the search, and "(2) the intent of the party performing the search." *Bowers,* 594 F.3d at 526. The first factor requires a consideration of the knowledge, encouragement, and participation of the government. *See United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). The second factor requires a consideration of the private party's intentions. "If the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, then the private party is not an agent of the government." *Id*. (internal quotations and citation omitted).

Here, both factors weigh against suppression. First, there is no evidence that Officer Kay knew that Ms. Parrish intended to investigate McCoy or search his cellphone. At 9:44 P.M., Officer Kay messaged Ms. Parrish, asking "You okay…? Did you go tonight?" Ex. C. This suggests that at 9:44 P.M Officer Kay did not know that Ms. Parrish had gone to the apartment, much less that she was conducting any investigation. Furthermore, the uncontradicted and credible testimony of both Officer Kay and Ms. Parrish demonstrated that Officer Kay did not direct, encourage, or foresee Ms. Parrish's searches of the phone, computer, and apartment. Unlike in *Hardin*, where a private citizen had no intent to search a suspect's apartment until police officers spoke with him and created a ruse regarding a non-existent water leak, Ms. Parrish independently decided to accept Ms. Huber's invitation to her apartment, independently

- 13 -

decided to investigate McCoy's identity and sexual preferences, and independently decided to access McCoy's cellphone without any prompting or encouragement from the Government. *Hardin*, 539 F.3d at 418. As explained by the Sixth Circuit, "[a] person will not be acting as a police agent merely because there was some antecedent contact between that person and the police." *United Lambert*, 771 F.2d 89.

The second factor also weighs against suppression. Ms. Parish repeatedly testified that she went to the apartment out of concern for the safety of Ms. Huber's child. Tr. II 35-36. She did not view herself as an agent of Officer Kay or the Marion police department. Ms. Parrish's intent to help a child that was potentially in danger arose independently of the government's intent to collect evidence for a criminal prosecution. *See Howard*, 752 F.2d at 227 ("[W]here . . . the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, . . . the private party is not an agent of the government.").

Because Ms. Parish was not acting as an agent of the government, her search of the apartment, of McCoy's phone, and Ms. Huber's computer does not fall within the purview of the Fourth Amendment.

## C.

McCoy next argues that suppression is warranted because the December 17, 2012 warrant lacked probable cause and no reasonable officer could have relied on it in good faith. Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As explained by the Sixth Circuit, to satisfy the probable cause requirement"[t]here must be a nexus between the place to be searched and the

- 14 -

evidence to be sought." *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (internal quotation and citation omitted). The Government concedes that the warrant did not explicitly tie McCoy to the address to be searched, and that it therefore lacked probable cause. ECF No. 22.

The fact that the warrant lacked probable cause does not in itself mandate suppression. Instead, recognizing that the primary purpose of the exclusionary rule is to deter police misconduct, the Supreme Court has held that the exclusionary rule does not bar "the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905, (1984). Under the good faith rule, the pertinent question is whether a "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922-23. The good faith rule does not apply, and suppression is therefore required, in the following four circumstances: 1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is so lacking in probable cause as to render official belief in its existence entirely unreasonable; or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable. *Id.* at 923.

McCoy argues that the third exception to *Leon's* good faith rule applies, and that the affidavit was so lacking in probable cause – or bare bones – that reliance on it was objectively unreasonable. "The inquiry into whether an affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one involved in determining whether an affidavit provides a substantial basis for the magistrate's conclusion of probable cause." *United States v. Rose,* 714 F.3d 362, 367 (6th Cir. 2013). A bare bones affidavit contains only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v.*

*Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (internal quotation and citation omitted). In reviewing the affidavit, courts are "bound by the four corners of the affidavit, and [] may not consider what the officer executing the warrant knew or believed." *Rose*, 714 F.3d at 367.

Here the affidavit, although poorly drafted, was not so bare bones so as to require application of the exclusionary rule. By explaining that McCoy's girlfriend resided at the address, that the concerned citizen met and socialized with McCoy at that address, that the concerned citizen discovered child pornography on McCoy's phone at that address, and that the concerned citizen sent information and email addresses related to that illegal activity, the affidavit provided factual circumstances to establish veracity, reliability, and basis of knowledge. *Laughton*, 409 F.3d at 748. The affidavit therefore created a minimal nexus between the address to be searched and the items sought.

Neither of the cases cited by McCoy requires a different outcome. In *United States v. Helton* an unknown, untested tipster provided "sparse" information to an FBI agent through multiple levels of hearsay that was never corroborated. *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003). The Sixth Circuit determined that the informant's statements were not reliable and did not establish a basis of knowledge. *Id*. The only other evidence provided in the affidavit was that phone records showed phone calls from the house to known drug dealers. *Id*. The Sixth Circuit concluded that this was insufficient to establish probable cause, and that a reasonable officer could not have relied on the affidavit. *Id*. at 825. That is different from the present case where Parrish was a known and reliable informant who had firsthand knowledge of McCoy's activities and personally sent information and email addresses to the swearing officer. Furthermore, the affidavit establishes that Officer Kay corroborated the information he received from Ms. Parrish through the National Center for Missing and Exploited Children.

- 16 -

In *United States v. Herron* the Eight Circuit determined that reasonable officers could not reasonably rely on an affidavit that provided no evidence that there was any illegal activity at the location to be searched, no evidence that the defendant participated in the alleged crime at the residence, no evidence the defendant was ever seen at the location of the alleged crime, and no evidence the defendant had been involved in past drug dealings. *United States v. Herron*, 215 F.3d 812, 814-15 (8th Cir. 2011). In fact, the only evidence the affidavit provided against the defendant was that he had a familial relation to the primary defendant in the case and that the primary defendant had stayed at his home four months earlier. *Id*. Here the affidavit contained reliable evidence from Ms. Parrish that McCoy had been present and engaged in illegal activity at the location to be searched.

Because a reasonably well trained officer could believe that the affidavit authorized by a magistrate established probable cause, suppression is not warranted in this case. *See Leon*, 468 U.S. at 905. McCoy's motion to suppress will therefore be denied.

### III.

Accordingly, it is **ORDERED** that the Court's previous order denying Defendant McCoy's motion to dismiss, granting McCoy's motion to amend, denying McCoy's motion to suppress, and amending the scheduling order, ECF No. 40, is **VACATED.**

It is further **ORDERED** that Defendant McCoy's motion to dismiss the indictment, ECF No. 15, is **DENIED**.

It is further **ORDERED** that Defendant McCoy's motion to amend his motion to suppress, ECF No. 34, is **GRANTED**.

It is further **ORDERED** that Defendant McCoy's Motion to Suppress, ECF No. 17, is **DENIED**.

- 18 -

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 22, 2016

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on February 22, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager